**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| MOUNTAIN WEST SERIES OF LOCKTON COMPANIES, LLC (formerly known as DENVER SERIES OF LOCKTON COMPANIES, LLC) and LOCKTON PARTNERS, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2019-0226-JTL |
| ALLIANT INSURANCE SERVICES, INC. | ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION**

Date Submitted: June 13, 2019
Date Decided: June 20, 2019

Kenneth J. Nachbar, Ryan D. Stottmann, Thomas P. Will, Jarrett W. Horowitz, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Michael B. Carlinsky, Andrew M. Berdon, Isaac Nesser, Kimberly E. Carson, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; *Counsel for Plaintiffs.*

Jody C. Barillare, MORGAN, LEWIS & BOCKIUS LLP, Wilmington, Delaware; Timothy J. Stephens, MORGAN, LEWIS & BOCKIUS LLP, New York, New York; *Counsel for Defendant.*

**LASTER, V.C.**

The Lockton family of affiliated companies engages in the insurance brokerage business. Plaintiff Mountain West Series of Lockton Companies, LLC (the "Mountain Series") is a series of a Missouri limited liability company through which Lockton conducts business in the western United States. The members of the Mountain Series include Lockton business leaders who have developed and manage portfolios of Lockton customers and receive, through their equity interest, a share of the profits. Plaintiff Lockton Partners, LLC is an affiliated entity whose members include a subset of Lockton business leaders with particularly valuable portfolios of Lockton customers. Through their equity interest in Lockton Partners, they receive an even greater share of the profits.

On March 12, 2019, twenty insurance professionals resigned *en masse* from Lockton's Denver office. Seven were members of the Mountain Series (the "Producer Members"). Two of the seven Producer Members were members of Lockton Partners (the "Producer Partners"). The other thirteen individuals worked closely with and supported the Producer Members. Within days, another six insurance professionals left Lockton, bringing the total number of former Lockton employees to twenty-six (collectively, the "Former Employees").

All of the Former Employees were bound by contracts containing restrictive covenants that prohibited them from soliciting Lockton's customers for a period of two years (and for the two Producer Partners, four years). All of the Former Employees were also bound by contracts containing restrictive covenants that prohibited them from soliciting Lockton personnel for a period of two years (and for the two Producer Partners,

four years). Before resigning, the Producer Members were required to give thirty-days advance notice to Lockton, in writing, and they remained bound to fulfill their professional obligations to Lockton during the notice period.

Immediately after resigning, every one of the Former Employees joined defendant Alliant Insurance Services, Inc., a Delaware corporation that competes with Lockton. None of the Former Employees gave prior notice to Lockton before resigning. Once at Alliant, the Former Employees engaged in a full-court press to solicit the customers that they had supported and serviced while at Lockton. The Former Employees also helped Alliant solicit additional Lockton personnel.

Alliant encouraged and facilitated the efforts of its new hires to solicit their Lockton customers. Indeed, having the Former Employees solicit their Lockton customers was the reason that Alliant engineered their mass resignations. Beginning in September 2018, Alliant spent months recruiting and then working closely with the Producer Members to plan and coordinate their departures. By December, Alliant had learned about and analyzed the restrictive covenants in the Producer Members' agreements. But rather than respecting those covenants, Alliant induced the Producer Members to leave Lockton and breach them. Alliant also expanded its recruiting efforts to the insurance professionals who supported the Producer Members. In some cases, there is evidence that the Producer Members assisted Alliant before leaving their employment with Lockton by soliciting Lockton customers and their fellow Lockton employees.

In this action, Lockton has sued Alliant for its scheme to raid Lockton's Denver office. Lockton has asserted five counts against Alliant: (i) tortious interference with

contract, (ii) tortious interference with business expectancy, (iii) misappropriation of trade secrets, (iv) aiding and abetting the misappropriation of trade secrets, and (v) aiding and abetting breaches of fiduciary duty.

To preserve the status quo pending a final decision on the merits after trial, Lockton moved for a preliminary injunction that would bar Alliant from soliciting Lockton's customers, servicing the Lockton customers that Alliant had captured to date, soliciting Lockton's employees, and using Lockton's confidential information. This decision holds that Lockton is entitled to preliminary relief. Because Lockton's claim for tortious interference with contract is sufficient to support entry of a preliminary injunction that will protect Lockton's interests, this decision focuses on that claim and does not reach Lockton's other theories. As to the claim for tortious interference with contract, Lockton has shown a reasonable probability of success on the merits, a threat of irreparable harm, and a balancing of the equities that favors the issuance of an injunction.

## I.     FACTUAL BACKGROUND

The facts are drawn from the extensive record developed in connection with the application for a preliminary injunction. The parties have submitted transmittal affidavits attaching a total of 318 exhibits, including twenty-six deposition transcripts.[1]

With its answering brief, Alliant submitted fifteen witness affidavits. For the most part, these lawyer-drafted submissions repeated the same language verbatim. In

---

[1] Citations in the form "Ex. —" refer to the exhibits attached to the transmittal affidavit filed by the plaintiffs.

individualized portions of the affidavits, the witnesses sought to explain away aspects of their testimony or to address problematic documents. These witnesses had been deposed, and Alliant's counsel could have elicited their explanations during deposition, thereby giving plaintiffs' counsel the opportunity to test the witnesses' assertions through cross-examination. In several instances, the same affiants had submitted affidavits in related litigation that were inconsistent with their current explanations. Those earlier affidavits made expansive, absolutist representations about the absence of any solicitation efforts, which discovery revealed to be inaccurate. The current round of affidavits attempted to explain away what discovery had uncovered, but many of those explanations seemed forced. I have discounted Alliant's "non-adversarial proffers"[2] and relied primarily on the contemporaneous documents and depositions.

What follows are the facts as they are likely to be found after trial. The description of the facts is necessarily constrained by the current evidentiary record.

## A. Alliant Targets Four Top Producer Members.

Peter Arkley is a senior Alliant executive who heads up its specialty business unit. Arkley has significant experience recruiting groups of personnel from other insurers and has conducted a series of mass recruitments on Alliant's behalf.

---

[2] *In re W. Nat. Corp. S'holders Litig.*, 2000 WL 710192, at *19 (Del. Ch. May 22, 2000) (describing witness affidavits and explaining that the Court of Chancery will "ordinarily attach little if any weight to such inherently self-serving and non-adversarial proffers"); *see Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1232 (Del. Ch. 2000) ("To the extent the affidavits contradict the depositions, this Court will exclude the offending affidavit testimony.").

Before the events giving rise to this case, Alliant did not have an office in Denver. Arkley set out to change that. In September 2018, he contacted Charles McDaniel, a Producer Member and Producer Partner in Lockton's Denver office who focused on the real estate, construction, and risk management markets. McDaniel had worked for Lockton since 1995, and he had served as CEO of the Mountain Series from 2000 until earlier in 2018, when he was demoted for reasons that the parties dispute. Arkley thought that McDaniel would be receptive to leaving Lockton because of the demotion. Arkley also believed that hiring McDaniel would open the door to recruiting other Lockton employees.

After a series of communications, McDaniel met with Arkley in person on October 29, 2018. Arkley subsequently arranged for McDaniel to meet with Alliant's senior management on November 12. To convince McDaniel to leave Lockton, Alliant offered him guaranteed compensation worth nearly $20 million plus the potential for earn-out compensation worth another $15 million. Alliant offered McDaniel this massive compensation package because Arkley and Alliant expected McDaniel to solicit his Lockton customers and bring them over to Alliant.

Arkley and Alliant also expected that McDaniel would bring other Lockton personnel with him. To that end, McDaniel's earn-out compensation would be based not only on his own production, but on the production of the group of employees he supervised, which would include the Lockton employees that he brought with him. Evidencing their expectation about McDaniel bringing along other Lockton employees, Arkley and other senior Alliant executives discussed their expectation that McDaniel would allocate some of his outsized compensation package to induce other Lockton professionals to join Alliant.

5

In its contract with McDaniel, Alliant took responsibility for the raid by committing to indemnify McDaniel against any claims that might arise from soliciting his Lockton customers. Alliant also agreed that it could not fire McDaniel for cause if it was shown that he had breached his contractual obligations to Lockton.

Alliant did not only pursue McDaniel. During September 2018, Arkley also contacted Nicholas Hansen and Robert Kinder. Hansen was a Producer Member who focused on the construction, energy, and cannabis markets. He quickly committed to joining Alliant and indicated that he would bring with him at least three staff members. Kinder was both a Producer Member and a Producer Partner who had worked at Lockton for approximately twenty years. He focused on the construction and surety markets. After communicating with Arkley, Kinder received a detailed term sheet from Alliant in December and met with Alliant senior management on January 11, 2019.

In December 2018, Arkley and Alliant expanded their efforts to include Derek Cady, a Producer Member who focused on the construction, real estate, and risk management sectors. Cady met with Arkley on December 4 and 12, then with Alliant senior management on January 11, 2019. On January 15, Cady told Alliant that he would join for a $1 million salary and $250,000 bonus, plus indemnification against theft or misappropriation of Lockton's confidential information.

## B.    The Contractual Obligations

During the recruiting process, Alliant obtained copies of the agreements that McDaniel, Hansen, Kinder, and Cady had entered into with Lockton, and Alliant had its outside counsel review the contracts. Through this process, Alliant learned about restrictive

6

covenants that bound McDaniel, Hansen, Kinder, and Cady, including restrictions on soliciting Lockton customers, soliciting Lockton employees, and using Lockton confidential information. Alliant also understood that the Producer Members had to give thirty-days prior written notice before terminating their employment.

The primary contractual restrictions that bound McDaniel, Hansen, Kinder, and Cady flowed from two agreements: (i) the Third Amended and Restated Operating Agreement of Lockton Companies, LLC and Each of Its Series (the "Series LLC Agreement"), and (ii) an Amended and Restated Member Agreement with the Mountain Series (the "Member Agreement"). In addition, McDaniel and Kinder were bound by the First Amended and Restated Operating Agreement of Lockton Partners, LLC (the "Partners LLC Agreement").

As Producer Members, McDaniel, Hansen, Kinder, and Cady each owned a "Producer Unit" in the Mountain Series, reflecting an equity interest in the Mountain Series that entitled them to profit distributions. In addition, each was a party to and bound by the Series LLC Agreement, which provided that a Producer Member could only resign as a member "on thirty (30) day's written notice to the Series." Ex. 28 § 5.10(a). The Series LLC Agreement also established a buy-out mechanism for the Producer Unit following a Producer Member's departure, which could result in the payment of substantial proceeds to the Producer Member.

Each Producer Member also was a party to and bound by a Member Agreement. *See* Exs. 21–24. Section 5.4 of each Member Agreement restricted the Producer Member from soliciting Lockton's customers or from servicing or working on any customer account that

7

the Producer Member could not solicit both during employment and for two years after the repurchase of their Producer Unit (the "Customer Non-Solicit"). It stated:

> While Member is a Producer Member of the Series and for a period of two (2) years following the sale of Member's Producer Unit . . .
>
> (a) Member shall not, directly or indirectly, for himself or on behalf of any other Person, solicit, induce, persuade or encourage, or attempt to solicit, induce, persuade or encourage, any of the Customer Accounts described below, if any such Customer Account qualified as a Customer Account within the six (6) month period immediately preceding the sale of Member's Producer Unit, to reduce, terminate or transfer to a competitor any products or services that are the same or substantially similar to, or directly competitive with, the products or services provided by the Series, the Other Series or any Affiliate.
>
> Member shall not, directly or indirectly, for himself or on behalf of any other Person,
>
> > (i) accept, service, or work on, or attempt or threaten to accept, service or work on, any such competitive business from any of the Customer Accounts that Member may not solicit, or
> >
> > (ii) in any way do business with any of the Customer Accounts that Member may not solicit to the extent such business is the same or substantially similar to that provided by the Series, the Other Series or any Affiliate.[3]

Notably, the Customer Non-Solicit encompassed not only blatant solicitation, but also actions taken to "induce, persuade or encourage, or attempt to solicit, induce, persuade or encourage" any Lockton customer to leave Lockton. And it covered these activities whether engaged in "directly or indirectly."

Section 5.3 of each Member Agreement restricted the Producer Member from

---

[3] In the Member Agreement, this provision and the others quoted in this decision appear in large block paragraphs. To promote legibility, this decision has added formatting.

soliciting Lockton employees, both during employment and for two years after the repurchase of their Producer Unit (the "Employee Non-Solicit"). It provided as follows:

> While Member is a Producer Member of the Series, and for a period of two (2) years following the sale of Member's Producer Unit . . .
>
> Member shall not, directly or indirectly, for himself or on behalf of any other Person, solicit, recruit, hire, induce, persuade, or encourage, or attempt to solicit, recruit, hire, induce, persuade or encourage, any employee, member or consultant of Series or any Other Series or Affiliate . . . to terminate his/its employment, membership or consultant relationship with, or to render services for any competitor of Series, or any Other Series or Affiliate, as applicable, and shall not otherwise take any action to interfere with, or attempt to interfere with, any employee's, member's or consultant's relationship with Series, or any Other Series or Affiliate, as applicable.

Like the Customer Non-Solicit, the Employee Non-Solicit encompassed not only blatant solicitation, but also actions taken to "recruit . . . , induce, persuade or encourage" any Lockton personnel to leave Lockton, as well as any action "to interfere with, or attempt to interfere with" an employee's relationship with Lockton. And it covered these activities whether engaged in "directly or indirectly."

Section 4.3 of each Member Agreement addressed the use of Lockton's "Confidential Information," which the Member Agreement elsewhere defined in impressively expansive terms (the "Confidentiality Restriction"). Section 4.3 stated:

> While Member is a Producer Member of the Series and at all times thereafter, and except with the prior written consent of the applicable Lockton Entity or as is reasonably necessary for Member to perform Member's responsibilities as a Producer Member of the Series, Member shall not, directly or indirectly,
>
> (a) disclose, or attempt to disclose, Confidential Information to anyone other than the members, officers or authorized employees, attorneys or other agents and fiduciaries of the applicable Lockton Entity,
>
> (b) use, or attempt to use, Confidential Information for any unauthorized purpose, or

9

(c) acquire, access, duplicate, copy, remove, download, upload, save, email, transmit or otherwise take, or attempt to do any of the foregoing with respect to, Confidential Information for any unauthorized purpose.

In Section 4.2(f), each Producer Member acknowledged and agreed that "the unauthorized disclosure, use, acquisition, access, duplication, removal, transmission or other appropriation of such Confidential Information at any time is prohibited and, whether actual or threatened, will cause irreparable injury to the Lockton Entity or Lockton Entities whose Confidential Information is at issue."

In Section 7.1, the parties to each Member Agreement stipulated that (i) "a breach of this Agreement will result in irreparable harm" and that (ii) "in the event of a breach of this Agreement by Member, damages would be difficult or impossible to ascertain." The parties further stipulated in Section 7.1 that "in the event of Member's breach, attempted breach, or threatened breach of this Agreement, the Series . . . shall be entitled to obtain a temporary restraining order, a preliminary injunction, and an injunction permanently enjoining and prohibiting the breach of this agreement." Somewhat redundantly, Section 7.2 of the Member Agreement provided:

> Member acknowledges, and agrees that strict compliance with this Agreement is necessary to protect the Confidential Information, goodwill and other legitimate protectable business interests of the Series . . . and that, as described above, a breach of this Agreement will result in irreparable harm and continuing damage to the Series . . . for which money damages may not provide adequate relief.

Each Member Agreement thus contained multiple sections in which the Producer Members stipulated contractually to the existence of irreparable harm in the event of breach.

McDaniel and Kinder were also Producer Partners, an elite status within Lockton

reflecting their ability to generate at least $4 million in annual revenue. When they became Producer Partners, each received a "Partnership Unit" reflecting an equity interest in Lockton Partners. Each Producer Partner was a party to and bound by the Partners LLC Agreement. *See* Exs. 207, 242. As with the Series LLC Agreement, the Partners LLC Agreement provided for a repurchase of the Partnership Unit that could result in the Producer Partner receiving substantial compensation.

In Section 5.1 of the Partners LLC Agreement, each Producer Partner reaffirmed the restrictive covenants that the Producer Partner had agreed to as Producer Members. In addition, each Producer Partner agreed to a comparable restriction that extended for a period of four years after the sale of the Partnership Unit. Through this provision, McDaniel and Kinder agreed to a separate, four-year Customer Non-Solicit and Employee Non-Solicit.

The Partners LLC Agreement also contained provisions addressing the threat of irreparable harm to Lockton Partners and the consequent availability of injunctive relief. In Section 5.3, each Producer Partner agreed that "a breach of this Agreement will result in irreparable harm and continuing damages to the Company . . . and that, in the event of a breach of this Agreement by Producer Partner, damages would be difficult or impossible to ascertain." In that section, each Producer Partner further agreed that

> in the event of Producer Partner's breach, attempted breach, or threatened breach of this Agreement, the Company and if applicable, any of the Series . . . shall be entitled to obtain a temporary restraining order, a preliminary injunction, and an injunction permanently enjoining and prohibiting the breach of this Agreement.

In Section 5.4, another arguably redundant provision, each Producer Partner agreed that "a

11

breach of this Agreement will result in irreparable harm and continuing damage to the Company and, if applicable, any of the Series . . . for which money damages may not provide adequate relief."

## C.     Alliant Expands Its Recruiting Efforts.

After starting with McDaniel, Kinder, Hansen, and Cady, Alliant expanded its efforts to encompass other Former Employees. They successfully recruited three other Producer Members, three senior managers, one operations recruiting executive, and fifteen technical, business development, or service support employees.

The three other Producer Members were Gregory Winter, Raymond Paolini, and Richard Schwartzenberger. Winter focused on the cannabis and benefits markets, Paolini focused on the construction, real estate, energy, and benefits markets, and Schwartzenberger focused on the financial services, energy, and construction markets. As Producer Members, each was a party to and bound by the Series LLC Agreement and a Member Agreement. During the recruiting process, Winter, Paolini, and Schwartzenberger sent their agreements to Alliant.

The three senior managers were AJ Jain (Surety Bond Department Manager), Jason D'Orvilliers (Real Estate Unit Manager), and Sarah Matthews (Real Estate SVP, Strategic Lead). The three senior managers were bound by employment agreements with Lockton that contained restrictive covenants prohibiting solicitation of Lockton personnel and customers during employment and for a period of two years afterwards. They had also entered into incentive compensation arrangements with Lockton that contained similar restrictions. During the recruiting process, Jain and Matthews sent their agreements to

12

Alliant.

The other sixteen professionals were employees who largely provided technical expertise, business development resources, or service support to the departing Producer Members. Like the Producer Members, most focused on the real estate, construction, surety, energy, or cannabis markets. Every employee was subject to at least one contract containing restrictive covenants that prohibited solicitation of Lockton personnel and customers during employment and for a period of two years afterwards.

**D.     Preparations for the Coordinated Walkout**

Alliant coordinated the mass resignation of twenty Former Employees for March 12, 2019. Arkley instructed the Former Employees to resign without notice, even the Former Employees who had thirty-day contractual notice obligations. To conceal this instruction, Alliant's outside counsel told Arkley to pass it along verbally rather than putting it in writing.

Alliant initially targeted Friday, March 8, 2019 for the walkout, then decided that the date should be moved to Monday, March 11, because "[*i*]*f the resignations happen Friday, Lockton will have all weekend to prepare litigation strategy before the new hires are able to bring in business.*" Ex. 7 at '479 (emphasis in original). Alliant then moved the resignation date to Tuesday, March 12, because the Mountain Series leadership would be at a company retreat in Arizona that day, which would further interfere with Lockton's ability to respond.

In the final days and hours before the mass walkout, McDaniel told several of his largest accounts he was preparing to leave Lockton. Several Former Employees printed

confidential and proprietary Lockton documents, including customer and prospect lists, business plans, and personnel contact lists. There is powerful circumstantial evidence that the Former Employees used these materials to assist Alliant.

### E.     March 12: Resignation Day

On the morning of March 12, 2019, while the Mountain Series leadership was in Arizona, twenty Former Employees simultaneously submitted their resignations, effective immediately, and headed to Alliant's newly rented facility. Within hours, they had been hired and signed employment agreements. Uniformly, their agreements with Alliant contain restrictive covenants nearly identical to their agreements with Lockton, including (i) a two-year post-employment non-solicitation covenant covering customers and employees, (ii) protections for confidential information, (iii) an obligation to provide thirty-days prior notice before resigning, and (iv) an acknowledgment of irreparable harm and entitlement to a preliminary injunction in the event of breach.

The Former Employees were also told that Lockton's outside counsel represented them. Several were asked to join a lawsuit that Lockton filed in Colorado seeking to invalidate the restrictive covenants in their agreements with Lockton.

Later that day, Arkley called a meeting during which he identified Lockton personnel that he wanted to recruit. He told one Former Employee that Alliant had already hired twenty-one of Lockton's people and wanted five to eight more. The Former Employees helped identify additional Lockton employees for Alliant to target. Alliant has in fact continued to recruit Lockton employees since March 12, 2019. By March 19,

14

another six professionals had joined Alliant, bringing the total number of Former Employees to twenty-six.

Also on March 12, 2019, the Former Employees began soliciting as many Lockton customers as they could. All of this solicitation activity was undertaken with Alliant's support and encouragement. Within twenty-four hours, six Lockton customers had formally indicated their intent to transfer their business to Alliant by executing broker-of-record letters, and eleven others had indicated their intent to execute broker-of-record letters. On March 15, Arkley sent a group text message congratulating the Lockton recruits on having "established a business in 3 1/2 days." Ex. 15. He exhorted his new employees to "keep going!!!!!" *Id.* Another Alliant executive exhorted them to "Go go go. Call everyone." Ex. 16. The Former Employees did as they were asked.[4]

## F.    The Effects on Lockton

The Former Employees' solicitation efforts have had a massive effect on Lockton. By the date of the preliminary injunction hearing, Alliant had solicited at least 144 Lockton customers. Fifty customers had moved their business to Alliant. Two other customers had announced that instead of renewing their business with Lockton, they would issue requests for proposal that would permit any firm to bid.

Every single one of the Lockton customers that moved their business was either a customer of a Producer Member or had their business serviced by Jain or other Former

---

[4] *See* Ex. 33 at 139, 143, 233, 245; Ex. 76 at 94, 98, 116, 122–23; Ex. 89 at 213, 233–34, 241, 252; Ex. 140 at 71, 91–93; Ex. 146 at 17; Ex. 158 at 187–88; Ex. 307.

Employees. The Producer Members and other Former Employees have personally conducted the solicitation efforts. In this action, Arkley and the Former Employees testified that they are continuing to solicit Lockton customers.[5]

## G. Multi-Forum Litigation

On March 12, 2019, the same day that they resigned from Lockton, ten of the Former Employees sued Lockton in Colorado. Their lawsuit sought a declaratory judgment that the restrictive covenants in their agreements were void under Colorado law. That lawsuit has been dismissed on the basis of forum-selection clauses in the agreements which choose courts in the State of Missouri.

On March 13, 2019, Lockton sued the Producer Members in state court in Missouri. In that action, Lockton seeks to enforce the restrictive covenants against the Producer Members themselves. Lockton subsequently filed a lawsuit in federal court in Missouri against the three senior managers. Lockton is currently attempting to move the federal action to state court and consolidate it with the other proceeding.

Lockton did not sue Alliant in Missouri, believing that Alliant would contest jurisdiction there. Instead, on March 22, 2019, Lockton filed this action against Alliant. The complaint contains five counts:

- Count I asserts that Alliant tortiously interfered with the plaintiffs' rights under their agreements with the Former Employees.

---

[5] *See* Ex. 32 at 420; Ex. 76 at 251; Ex. 146 at 16; Ex. 153 at 10–11.

16

- Count II asserts that Alliant tortiously interfered with Alliant's prospective economic advantage and prospective business relationships.

- Count III asserts that Alliant violated the Delaware Uniform Trade Secrets Act.

- Count IV asserts that Alliant aided and abetted the misappropriation of trade secrets.

- Count V asserts that Alliant aided and abetted breaches of fiduciary duty.

Lockton sought injunctive relief and requested expedition.

During the hearing on the motion to expedite, I commented that this case would primarily involve matters of Missouri or Colorado law, making it preferable for a court sitting in one of those states to hear the claims given the comparative advantage that such a court would have in dealing with its own law. Initially, each side's tactical preference for a particular forum foreclosed any productive effort to localize this dispute in a single jurisdiction: Lockton wanted to proceed in Missouri and did not want to do anything to undermine its arguments there, while Alliant felt the same way about Colorado. I granted expedition, noting that there was no jurisdiction that was capable of dealing promptly with Lockton's allegations against Alliant. A hearing on a motion for preliminary injunction was scheduled for June 13, 2019.

As this case unfolded, Alliant reluctantly sought to facilitate having the litigation proceed in Missouri. It first offered to submit to the jurisdiction of the Missouri court "co-extensive with the jurisdictional and venue defenses of the individual defendants." Dkt. 29 Ex. 1. Later, Alliant agreed to actually submit to the jurisdiction of the Missouri court and moved to intervene in Lockton's suit against the Producer Members. Because I believe that Missouri law will govern a substantial majority of the claims in this matter, I continue to

believe that a Missouri court is better positioned to decide this case on the merits. I also believe that it would be preferable (although not necessary) for a single jurisdiction to consider both the claims against the Former Employees and the claims against Alliant.

For understandable reasons resulting from the pressure of managing both a criminal and a civil docket, the Missouri court has had to give priority to pending criminal cases and has not been able to schedule a prompt hearing on an application for injunctive relief. Consequently, only this court is in a position to address in a timely fashion the interim relief that Lockton has requested.

## II. LEGAL ANALYSIS

To obtain a preliminary injunction, a plaintiff must demonstrate (i) a reasonable probability of success on the merits; (ii) that they will suffer irreparable injury if an injunction is not granted; and (iii) that the balance of the equities favors the issuance of an injunction. *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Co.*, 506 A.2d 173, 179 (Del. 1986). "The elements are not necessarily weighted equally. A strong showing on one element may overcome a weak showing on another element. However, a failure of proof on one of the elements will defeat the application." *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998).

### A. The Probability of Success on the Merits

The first element of the injunction test requires that the plaintiffs establish a reasonable probability of succeeding on the merits at a final hearing. *See Gimbel v. Signal Cos., Inc.*, 316 A.2d 599, 602 (Del. Ch.), *aff'd*, 316 A.2d 619 (Del. 1974). This standard "falls well short of that which would be required to secure final relief following trial, since

it explicitly requires only that the record establish a reasonable probability that this greater showing will ultimately be made." *Cantor Fitzgerald*, 724 A.2d at 579 (internal quotation marks omitted).

Lockton has established a reasonable probability of success on the merits of its claim that Alliant tortiously interfered with Lockton's rights under the Customer Non-Solicit, the Employee Non-Solicit, and the Confidentiality Restriction in the Member Agreements. The analysis of the Member Agreements applies equally to the parallel provisions in the Partners LLC Agreement. Because the analysis of the tortious interference claim is sufficient to support the issuance of injunctive relief that is adequate to protect Lockton's interests pending trial, this decision does not reach Lockton's other claims.

### 1.      Choice of Law

A threshold question exists as to which state's law governs Lockton's claim for tortious interference with the Member Agreements. The two potential choices are Colorado and Missouri. Colorado is the jurisdiction where the Denver office was located, where the Former Employees worked, and where the raid took place. Missouri is the jurisdiction where Lockton is both domiciled and headquartered, and where the Producer Members frequently interacted with Lockton senior management. Notably, the Member Agreements select Missouri law to govern their terms.

When resolving a choice-of-law issue, Delaware follows the Restatement (Second) of Conflict of Laws. *See, e.g.*, *Certain Underwriters at Lloyds, London v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017). For a tort claim, the restatement calls for a detailed, multi-factor analysis involving contacts with the competing jurisdictions and overarching

19

policies. *See* Restatement (Second) of Conflict of Laws §§ 6, 145 (Am. Law Inst. 1971). Where, however, the pertinent laws of the states in question are generally the same, there is no meaningful conflict and no need to conduct a choice of law analysis. *See Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at *8 (Del. Ch. Jan. 29, 2010).

In this case, Colorado and Missouri each recognize the same basic elements of a claim for tortious interference with contract; if anything, the Missouri elements are more detailed and exacting. *Compare Kystkowiak v. W.O. Brisben Cos., Inc.*, 90 P.3d 859, 871 (Colo. 2004) (*en banc*), *with W. Blue Print Co. v. Roberts*, 367 S.W.3d 7, 19 (Mo. 2012) (*en banc*). The only pertinent substantive difference between the two jurisdictions relates to the enforceability of restrictive covenants. By statute in Colorado, restrictive covenants are void unless they fall into certain exceptions. *See* Colo. Rev. Stat. § 8-2-113(2). Under Missouri law, by contrast, restrictive covenants are generally enforced.

For simplicity, this decision analyzes the tortious interference claim under Missouri law, both because that is the law that the Member Agreements selected, and because the elements of the claim under Missouri law are relatively more detailed, which favors Alliant. Under Missouri law, a party pursuing a claim for tortious interference must show (i) the existence of a valid contract; (ii) the defendant's knowledge of the contract; (iii) intentional action by the defendant that induces or causes a breach; (iv) absence of justification; and (v) damages. *W. Blue*, 367 S.W.3d at 19. Whether the Colorado statute invalidates the provisions in the Member Agreements falls within the first element of the Missouri framework, which calls for testing the validity of the underlying contract.

20

### 2. The Existence of a Valid Contract

As to the first element, it is reasonably probable that a court applying Missouri law would hold that the Member Agreements were valid. Alliant does not generally dispute their validity, only the validity of the restrictive covenants as a matter of Colorado law.

For starters, it is worth noting that Alliant appears to have manufactured its position that the restrictive covenants are invalid under Colorado law solely for purposes of litigation. When Alliant analyzed the Member Agreements during the recruiting process, its counsel concluded that the restrictive covenants were likely governed by Missouri law, would be valid under Missouri law, and were even likely to be valid under Colorado law.[6]

---

[6] *See* Exs. 3, 6, 43. Lockton obtained the legal memoranda in which Alliant's counsel analyzed the Member Agreements because Alliant prepared a grossly defective privilege log during the course of expedited discovery leading up to the preliminary injunction hearing. The expedited schedule did not permit do-overs, and the serious problems with Alliant's log suggested that Alliant had not made a good-faith effort when preparing its log but instead was attempting to invoke privilege expansively to hide problematic documents. For example, Alliant used two virtually identical and generic descriptions for 98% of the documents on its log, and Alliant combined the recipient, copy recipient, and blind copy recipient fields into a single column, so that Lockton had no way to know whether a lawyer was a primary or secondary recipient of a document. The latter maneuver also suggested that Alliant was invoking privilege broadly whenever a lawyer appeared on a document, regardless of whether the document contained legal advice, and had copied lawyers on documents to generate a basis for claiming privilege.

By failing to assert its privilege claims properly, Alliant waived them. *See Klig v. Deloitte LLP*, 2010 WL 3489735, at *4 (Del. Ch. Sept. 7, 2010) (collecting authorities). Some of the documents that Alliant had to produce, such as the legal memoranda, would have been privileged had Alliant logged them properly. Other documents, however, demonstrated that Alliant was in fact asserting privilege broadly for non-privileged matters, simply because a lawyer appeared on the document.

Moreover, the documents for which Alliant asserted privilege revealed additional dimensions to Alliant's misconduct. First, as noted, the documents showed that Alliant

Before being represented by Alliant's counsel for purposes of this litigation, none of the Former Employees ever expressed the view that their restrictive covenants were invalid. Instead, they believed they were subject to binding non-solicitation obligations. *See* Exs. 48, 49. Most notably, when hiring the Former Employees, Alliant had them sign agreements containing virtually identical restrictive covenants and selected Colorado law to govern those agreements. *See, e.g.*, Exs. 116–18, 223–25. Alliant's principal defense in this action is one that Alliant itself does not appear to believe.

Turning to the argument on the merits, the Member Agreements select Missouri law to govern their terms. Assuming a court accepted this contractual specification, it is reasonably probable that the court would hold under Missouri law that Lockton had a legitimate interest in protecting the information and relationships that the Producer

---

never really believed that Colorado law would govern the restrictive covenants in the Member Agreements or that the restrictive covenants were invalid, despite taking that position before three different courts. Second, they showed that Alliant actually knew that the Producer Members were bound by a thirty-day advance notice requirement before resigning, even though Alliant denied knowing about the requirement in its answer and sworn interrogatory responses. *Compare* Ans. ¶ 11, *and* Ex. 50 ¶ 4, *with* Ex. 14, *and* Ex. 51. Third and most troublingly, they showed one of Alliant's outside attorneys telling Arkley to instruct McDaniel to delete documents, recognizing that it would not prevent them from being gathered from the Lockton server but calling the destruction "a start." Ex. 54. It now seems possible that the crime/fraud exception to the attorney-client privilege would provide an independent basis for ordering production of at least some of the entries on Alliant's log. *See* 11 Del C. § 1269(2) (addressing efforts to prevent or suppress the production of evidence through "any act of concealment, alteration or destruction"); *see also* Cal. R. Prof'l Conduct 3.4(a) ("A lawyer shall not . . . unlawfully obstruct another party's access to evidence, including a witness, or unlawfully alter, destroy, or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act.").

Members developed as part of their employment with Lockton.[7] It is also reasonably probable that a court applying Missouri law would hold that Lockton could legitimately insist on the restrictive covenants that the Member Agreements contained in return for granting the Producer Members valuable equity interests in the Mountain Series.[8] It is also reasonably probable that a court applying Missouri law would find that the two-year Customer Non-Solicit and Employee Non-Solicit, as well as the Confidentiality Restriction, were reasonable when applied to sophisticated, highly compensated employees who received equity interests in the Mountain Series.[9]

As noted, Alliant argues vigorously that Colorado law would apply to the Member Agreements and invalidate the restrictive covenants that they contain. Without reaching the question of whether Colorado law would govern and invalidate the contracts of Former Employees who were not Producer Members, it is reasonably likely that a court would not

---

[7] *See Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 841–42 (Mo. 2012) (*en banc*) ("[E]mployer has a legitimate interest in customer contacts to the extent it seeks to protect against the influence an employee acquires over his employer's customers through personal contact." (internal quotation marks omitted)); *Systematic Bus. Servs., Inc. v. Bratten*, 162 S.W.3d 41, 49 (Mo. Ct. App. 2005) (recognizing "customer contacts and trade secrets" as a "legitimate protectable interests").

[8] *See H&R Block Tax Servs. LLC v. Frias*, 2018 WL 934901, at *2 (W.D. Mo. Feb. 16, 2018) (restrictive covenants "appropriate . . . because they were agreed to as part of a business transaction"); *Orthotic & Prosthetic Lab, Inc. v. Pott*, 851 S.W.2d 633, 643 n.4 (Mo. Ct. App. 1993) ("Missouri courts have long recognized a distinction between covenants ancillary to a sale of a business and covenants merely ancillary to an employment contract, showing substantially greater liberality in enforcing the former.").

[9] *See generally Schott v. Beussink*, 950 S.W.2d 621, 627 (Mo. Ct. App. 1997); *Prop. Tax Representatives, Inc. v. Chatam*, 891 S.W.2d 153, 158 (Mo. Ct. App. 1995).

apply Colorado law to the Member Agreements. Those agreements were entered into between Lockton and individuals who were both sophisticated and highly compensated, and who received equity interests in the Mountain Series as part of the transaction. The Mountain Series is a series of a Missouri LLC, and Missouri law governs its internal affairs. Missouri law therefore governs the Series LLC Agreement, and the Member Agreements appear closely related to the Series LLC Agreement.

Assuming for the sake of analysis that Colorado law did apply, it is reasonably likely that a court applying the Colorado statute would uphold the restrictions in the Member Agreements. The Colorado statute states:

> Any covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void, but this subsection (2) shall not apply to:
>
> (a) Any contract for the purchase and sale of a business or the assets of a business;
>
> (b) Any contract for the protection of trade secrets;
>
> (c) Any contractual provision providing for recovery of the expense of educating and training an employee who has served an employer for a period of less than two years;
>
> (d) Executive and management personnel and officers and employees who constitute professional staff to executive and management personnel.

Colo. Rev. Stat. § 8-2-113(2). It is reasonably likely that a court applying Colorado law would hold that subsections (a), (b), and (d) apply to the Member Agreements.

It is reasonably likely that subsection (a) would apply because the Member Agreements conveyed an interest in the Mountain Series to the Producer Members. Alliant has argued that this exception only applies to a whole-company transaction, but Colorado

24

courts have applied this exception to the sale of a minority ownership position.[10] It is reasonably likely that a court would follow those precedents here.

It is reasonably likely that subsection (b) would apply because the Member Agreements protected trade secrets. This exception has been held to apply to non-solicitation clauses designed to protect, for example, "client lists, customer contracts, pricing information, detailed debtor information, client information and customer log-in codes," as well as "a client's number of unused pre-purchased collection accounts, a debtor's personal information, and the percentage of debt recovered per client." *Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 527 (Colo. App. 2011) (internal quotation marks omitted).

It is reasonably likely that subsection (d) would apply because the Producer Members were executive and management personnel. Factors to consider include whether the employee is "in charge" of a significant portion of a business, supervises employees, has discretion to act in an unsupervised capacity, or is highly compensated. *See DISH Network Corp. v. Altomari*, 224 P.3d 362, 368 (Colo. App. 2009); *Porter Indus., Inc. v. Higgins*, 680 P.2d 1339, 1342 (Colo. App. 1984). The Producer Members were in charge of generating, maintaining, and servicing portfolios of business worth millions of dollars.

---

[10] *See King v. PA Consulting Gp.*, 485 F.3d 577, 587–88 (10th Cir. 2007); *Boulder Med. Ctr. v. Moore*, 651 P.2d 464, 465 (Colo. App. 1982); *Harrison v. Albright*, 577 P.2d 302, 304–05 (Colo. App. 1977); *see also Reed Mill & Lumber Co. v. Jensen*, 165 P.3d 733, 736 (Colo. App. 2006) (holding that six-year non-compete fell within statutory exception but invalidating it as unreasonable).

They had significant freedom of action when doing so, and they supervised and were assisted by teams of insurance professionals. They were also highly compensated. Alliant has tried to argue that the Colorado cases require more, but it appears to me that Lockton has the stronger reading.

Given this analysis, the plaintiffs have established a reasonable probability of showing that the Series LLC Agreement and the Member Agreements were valid contracts between Lockton and the Producer Members.

### 3. Alliant's Knowledge of the Agreements

As to the second element, it is reasonably probable that a trier of fact would find that Alliant knew of the Member Agreements. The record reflects that Alliant received copies of the agreements and had its outside counsel review and analyze them.

### 4. Alliant's Actions to Induce Breach

As to the third element, it is reasonably probable that a court applying Missouri law would find that the Producer Members breached the Member Agreements by (i) soliciting Lockton customers in violation of the Customer Non-Solicit, (ii) soliciting Lockton employees in violation of the Employee Non-Solicit, and (iii) taking and using confidential information in violation of the Confidentiality Restriction. The evidence of violations of the Customer Non-Solicit is overwhelming and undisputed. The evidence of violations of the Employee Non-Solicit is disputed but significant. The evidence of violations of the Confidentiality Restriction is less strong, but Lockton has made a showing sufficient to support a finding of a reasonable probability of success on the merits.

It is also reasonably probable that a trier of fact would find that Alliant intentionally

26

acted to induce the Producer Members' breaches of the Customer Non-Solicit, the Employee Non-Solicit, and the Confidentiality Restriction. Alliant's desire to have the Producer Members breach the Customer Non-Solicit is essentially undisputed. The contemporaneous evidence shows that Alliant wanted the Producer Members to solicit their former Lockton customers. *See* Exs. 15–16. Alliant's witnesses conceded the point. Ex. 32 at 172–73; Ex. 164 at 161. This leaves the Employee Non-Solicit and the Confidentiality Restriction.

### a. The Employee Non-Solicit

The evidence regarding the Employee Non-Solicit is disputed, but Lockton has established a reasonable probability of success on this issue. Lockton has shown patterns of out-of-office meetings at dates and times which indicate that McDaniel, Kinder, Hansen, and Cady, while they were still Lockton employees, were providing assistance to Arkley and Alliant in recruiting other Lockton personnel. For example, while still at Lockton, Hansen indicated to Alliant that he would be bringing three employees with him, understood that a large group of employees would be joining Alliant, and spoke with Former Employee Dan Reitman about joining Alliant. *See* Ex. 63; Ex. 96; Ex. 145 at 20, 24–25. Hansen also appears to have played a key role in recruiting Producer Member Schwartzenberger, who communicated with Hansen using his son's email address and the subject line, "Destiny."[11]

---

[11] *See* Ex. 147. In one example of Alliant's problematic affidavits, Hansen and Schwartzenberger submitted affidavits in the Missouri action in which they denied having any involvement in recruiting efforts. After the "Destiny" email surfaced, they filed

There is also unrebutted testimony from Andrea Steinberg, a Lockton Senior Vice President who had serviced many of McDaniel's accounts for nearly twenty-five years. She provided a first-hand account of McDaniel's attempts to solicit her on December 1, 2018, while both were still Lockton employees, after asking her to have coffee at Starbucks. Her account also explains how McDaniel coordinated with Arkley. During their meeting, McDaniel said that Arkley would be calling.[12] Two days later, Arkley texted Steinberg on her cell phone.[13]

During the hearing on the preliminary injunction application, Alliant's counsel argued that McDaniel could not have solicited Steinberg, simply because he did not ask her outright, "Will you join Alliant?" But the Employee Non-Solicit does not stop at literal and explicit solicitation. It prohibits a Producer Member from attempting "directly or indirectly" to "solicit, recruit, hire, induce, persuade, or encourage" any employee to

---

affidavits in this action in which they gave questionable explanations for the email and did not attempt to explain why the communication had been omitted from their Missouri affidavits.

[12] *See* Ex. 12 at 122–24. In another example of Alliant's problematic affidavits, McDaniel originally submitted an affidavit in the Missouri action in which he declared under oath that he had not solicited anyone. After Steinberg testified, McDaniel filed an affidavit saying that he did "not remember that alleged meeting" or "having that alleged conversation." Dkt. 229 at 10–11.

[13] *See* Ex. 12 at 178, 224. Arkley testified that he did not remember where he got Steinberg's number, but that he probably got it from one of the insurance wholesalers. Ex. 32 at 260, 262–64. The night before, Arkley had dinner with McDaniel. The simplest and most likely explanation is that McDaniel reported on his conversation with Steinberg and gave Arkley her number.

terminate her relationship with Lockton. It also prohibits a Producer Member from attempting to "interfere with [an employee's] relationship with [the Mountain Series]."

Here is Steinberg's unrebutted testimony about what McDaniel said:

He said that he was considering leaving . . . and so that he -- so he had been looking at other opportunities.

And he found a company, and he said the name.

***

And I said, okay. I said, I don't think I know anything about them.

And he said, you know, Well, I'm considering leaving because it doesn't feel good here anymore, and they seem to have offered the best opportunity. I'm excited to grow something. And he said, you know, I've got a good 10 years left in me, that excites me, and I'm just curious if you'd be interested in joining me and starting something new.

Ex. 12 at 122–23. Asking "if you'd be interested in joining me and starting something new" was an attempt to "solicit, recruit, hire, induce, persuade, or encourage" Steinberg to terminate her relationship with Lockton.

And McDaniel did not stop there. After Steinberg expressed mixed emotions about the idea, McDaniel continued, saying: "I'd like you to keep this secret. I am not allowed to solicit you, but I would like for someone from Alliant to call you. And he said his name was Peter Arkley, that he worked out of the L.A. Office, described him as a handsome, early 60s gentleman." *Id.* at 124. This was another attempt to "solicit, recruit, hire, induce, persuade, or encourage" Steinberg to terminate her relationship with Lockton in which McDaniel laid the groundwork for Arkley to call and make the explicit offer.

During his attempt to recruit Steinberg, McDaniel also revealed his knowledge

29

about others who were joining Alliant. Steinberg asked whether Matthews, one of McDaniel's top lieutenants, was also interested in going. McDaniel told her "yes" and added that Kinder, Cady, and Hansen were going as well. *Id.* When Steinberg spoke with Arkley, he confirmed that a team of people was joining Alliant. Ex. 13 ¶ 12. Both this and other evidence would support a finding that McDaniel and Arkley coordinated about recruiting Lockton employees while McDaniel was still at Alliant.[14] There is evidence that other Former Employees engaged in pre-departure recruiting efforts as well.[15]

In addition to the evidence regarding violations of the Employee Non-Solicit while the Producer Members were still at Alliant, the evidence indicates that the Producer Members assisted Alliant in recruiting Lockton employees after the Producer Members left Alliant. McDaniel continued to discuss Lockton employees with Arkley, and he continued

---

[14] *See* Ex. 76 at 188–89 (McDaniel agreeing that he talked with Arkley about Lockton employees in the commercial insurance department); Ex. 128 at 98–100 (Former Employee Erickson describing meeting with McDaniel followed by call from Arkley). In a text message that McDaniel sent to Arkley while he was still working at Alliant, McDaniel asked whether Arkley had been "able to talk to Nicks guys today." Ex. 143 at '607. It is obvious from context that "Nicks guys" were Lockton personnel who worked for Nicholas Hansen, including Reitman. Yet during their depositions, Arkley and McDaniel could not say who "Nicks guys" were. Arkley claimed not to remember and McDaniel posited implausibly that he was referring to energy personnel who already worked for Alliant. *See* Ex. 32 at 133, 332; Ex. 76 at 229, 233.

[15] *See, e.g.*, Ex. 122 (Former Employee Matthews indicating to Alliant personnel that a group of employees would be joining and coordinating arrangements); Ex. 127 (Former Employee Matthews providing Arkley's telephone number to another Former Employee); Ex. 313 (one Former Employee texting a second Former Employee "I want in" and second Former Employee responding: "Hahaha let's talk on the phone[.] No text").

to send text messages to Arkley about recruiting Lockton employees.[16] There is evidence that other Former Employees engaged in post-departure recruiting efforts.[17]

There is also powerful circumstantial evidence that Alliant knew McDaniel intended to breach the Employee Non-Solicit and wanted him to do so. In negotiations over his employment agreement, McDaniel asked for, and Alliant agreed to provide him with "absolute indemnification," including indemnification for all suits brought by Lockton. Ex. 109; *see also* Ex. 32 at 186. Alliant agreed to indemnify McDaniel "with respect to any civil claim . . . brought against him arising out of or related to the termination of his employment with his latest employer preceding his employment with Alliant." Ex. 52 at '249. Notably, the indemnification obligation carves out "any breach by Employee of his obligations to Former Employer with respect to theft or misappropriation of its trade secret, confidential, or proprietary information," but does not similarly exclude breaches of non-solicitation obligations. *Id.* The indemnification obligation also separately and explicitly

---

[16] *See* Ex. 76 at 238, 243; Ex. 133 at '462; Ex. 134 at '663–65. This is another example of Alliant's problematic affidavits. In affidavits submitted in the Missouri action, McDaniel and Arkley averred flatly that they never discussed any other Lockton employees. The discovery record showed that those averments were untrue. Arkley then filed an affidavit in this court in which he admitted that he in fact had discussed Lockton employees with McDaniel. McDaniel filed an affidavit in this court in which he tried to explain his deposition testimony and claimed that he had "never tried to hide" that he discussed other Lockton employees with Arkley. Dkt. 229 at 11. Given his flat denial to the Missouri court, that assertion is difficult to stomach.

[17] *See, e.g.*, Ex. 142 (Former Employee Jain commenting on status of a Lockton employee); Ex. 157 (Former Employee Jain asking to be kept updated on the status of a Lockton employee).

extends to any claim "arising out of the discharge of his duties for Alliant or Employee's obedience to Alliant's direction." *Id.* All of the Former Employees received comparable indemnification. For McDaniel, whom Alliant viewed as the top dog in the raid, Lockton went further and agreed to eliminate Alliant's ability to fire him "for cause" based on any act or omission that constituted a breach of any confidentiality provision or restrictive covenant in his agreements with Lockton. *See* Ex. 289 at '381.

The economic package that Alliant gave McDaniel points in the same direction. It included an earn-out component that included amounts generated by personnel working in his operation. *See* Exs. 2, 113. Alliant did not have any employees in Denver before the raid. The people who would be working for McDaniel were his team from Lockton, whom he wanted to bring with him. Three other Producing Members—Kinder, Cady, and Hansen—received similar supplemental compensation plans that paid them for everyone working in their operation. *See* Exs. 116–18. Matthews, whom Alliant regarded as "critical to securing a large Real Estate book" from Lockton's Denver office, also received a supplemental compensation plan. Ex. 120.

### b. The Confidentiality Restriction

The evidence that Alliant wanted the Producer Members to take and use Lockton's confidential information is the weakest of the three, but when viewed in the context of Alliant's other violations and the record as a whole, Lockton has established a reasonable probability of success on the merits. Alliant's strongest evidence against a violation is a set of procedures that it put in place to prevent the Former Employees from bringing electronic information with them from Lockton. These procedures included imaging the Former

32

Employees' computers and devices, ensuring they did not contain any Lockton material, and then blocking the Former Employees "for a short period of time" from accessing external devices, personal email, or cloud-sharing websites. Ex. 11 at '867. Alliant also had the Former Employees sign "Prospective Employee Departure Protocols," in which they agreed not to take, disclose, use, or otherwise misappropriate Lockton's trade secrets and confidential information. Ex. 230.

But there is powerful circumstantial evidence that Former Employees printed out important Lockton documents while still working at Lockton and either shared them with Arkley or took them with them to use at Alliant.

- On December 12, 2018, two days before meeting with Arkley in person, Cady printed his Lockton personal budget and Member Agreement. His budget listed all of his customers, organized by annual and monthly revenue. Both were exactly the type of documents that Arkley would want to see, and Cady sent an electronic copy of his Member Agreement to Arkley at the same time he was printing a copy for himself.

- On December 4, 2018, the day after he met with Arkley in person, Kinder printed out lists of Lockton employees with their direct extensions and cell phone numbers. He had never printed the lists before and never did it again.

- On March 4, 2019, Winter spoke with Arkley about potential employment with Alliant. On the same day, he printed out his confidential Lockton business plan. Two days later, he printed out a list of his personal prospects and production.

- On March 5, 2019, Former Employee Michael Dauro received an employment agreement from Alliant. On the same day, he printed out a list of Lockton employees' direct extensions and cell phone numbers. He had never done so before, and he never did so again. The next day, he met with Arkley in person.

The Former Employees also showed an amazing ability to recreate detailed prospect and client lists immediately after joining Alliant. Former Employee Leah Erickson claimed that she created a *new* prospect list for McDaniel, but it contains detailed historical

information describing meetings that took place over the previous nine months. Jain, one of the senior managers who left Lockton, claimed that by March 21, he had assembled a list of 350 contacts purely by recalling the names from memory and then finding their information on the internet, yet the contacts included home addresses, cell phone numbers, and fax numbers. The inclusion of difficult-to-obtain information like home addresses and cell phone numbers, together with outdated information like fax numbers strongly suggests that Jain removed a hardcopy list of his contacts when he left Alliant. Moreover, when plaintiffs' counsel checked some of the information, they found that much of it was outdated, such as disconnected phone and fax numbers or affiliations with companies that the identified individuals had left years before. A trier of fact could conclude that Jain lied about the source of the contact list.

### c.  Contributing Factors

In making a preliminary evaluation of Alliant's intent to induce breach, I have also taken into account Alliant's conduct with respect to other matters, including (i) the Producer Members' obligation to give thirty-days prior written notice before resigning from Lockton, (ii) Alliant's efforts to avoid creating an evidentiary record of its activities, and (iii) Alliant's role as the organizing force behind the employee exodus.

First, it is undisputed that the Producer Members resigned without giving the thirty days' prior notice required under the Series LLC Agreement. The contemporaneous evidence reflects Alliant instructing the Producer Members to resign without giving notice, even though Alliant and its outside counsel knew about the thirty-day requirement. Precisely because Alliant knew about the obligation, Alliant decided that it would "no

longer instruct[] employees in writing to resign without notice" and would "instead instruct them verbally." Ex. 14. It is reasonably probable that a trier of fact would find that Alliant took this action in an effort to prevent Lockton from using the thirty-day notice period to protect its interests, just as Alliant timed the mass resignations for March 12, 2019, so as to minimize the ability of Lockton management to respond. Alliant's obvious willingness to instruct employees to violate a clear contractual restriction evidences Alliant's intent, the presence of an overarching plan, and the absence of a mistake or accident.

Second, Alliant engaged in extensive efforts to avoid creating an evidentiary record of its activities, which crossed the line on important occasions into the actual destruction of evidence. Alliant's outside counsel repeatedly instructed Alliant executives to communicate orally or by telephone with Lockton personnel and not by email or text.[18] On one critical occasion, after learning that McDaniel had been sent an email to his Lockton email account from a lawyer who was advising him about his departure, Alliant's lead outside lawyer gave the following instructions to Arkley:

> First thing in the morning, please CALL McDaniel and tell him that his attorney (Jeff Springer) emailed to his Lockton email address. The email went to [Alliant executives, Alliant's outside counsel] and Chuck [McDaniel] . . . . You should also have Chuck [McDaniel] delete this and any other emails he has sent or received to/from Springer if on his Lockton email. It is too late to stop them from being saved by Lockton to their system, but

---

[18] *See, e.g.*, Ex. 299 (Alliant lawyer instructing executives, "Don't copy me. Tell him orally that his lawyer can call me if issues."); Ex. 300 (Alliant lawyer instructing Alliant executives, "I need two separate emails with no trail."); Ex. 301 (Alliant lawyer instructing Alliant executive to "verbally get [a phone number] to Nick Hansen (the candidate)").

it's a start. CHUCK SHOULD DEAL WITH THIS BY TELEPHONE, NOT BY EMAIL.

Ex. 54. At the time, Alliant was anticipating litigation with Lockton, yet Alliant's lawyer instructed Arkley to tell McDaniel to "delete this and any other emails." While recognizing that Lockton might already have copies saved on its server, Alliant's lawyer described the deletion of evidence as "a start."

Consistent with the lawyer's instruction and attitude, Arkley deleted texts from McDaniel during the days leading up to the litigation. *See* Ex. 32 at 21–23. McDaniel's surviving texts and emails with Arkley suggest substantial coordination on recruiting Lockton employees, supporting an inference that the deleted texts were incriminating.

Along similarly disturbing lines, Jain wiped his Lockton-issued iPhone and iPad on the day he resigned.[19] He also denied taking any documents out of Lockton's offices during the weekend of March 9 and 10, 2019, which preceded the mass resignations on March 12, only to be impeached with surveillance video showing him leaving with binders of documents and returning empty handed. Jain has tried to argue that these were personal documents, and many of them likely were, but it also seems highly likely that Jain slipped hard copies of key Lockton information into the binders, including the contact list that he claimed not to have.

---

[19] *See* Ex. 33 at 64. Jain claimed he wiped both devices so that Lockton would not be able to view photos taken at a religious ceremony. While he may have had reason to restrict access to those photos, that does not explain why he needed to wipe the entire devices, especially when it was reasonably likely that he knew that information on them would be the subject of litigation.

36

Third, any trier of fact considering whether Alliant intended to induce Lockton employees to breach the Confidentiality Restriction would have to take into account Alliant's role as puppet master. Put simply, Alliant made the mass departure happen. While doing so, Alliant engaged in a credibility-impairing pattern of behavior, which included the production of contemporaneous documents that contradicted the Alliant witnesses' original affidavits, the submission of a second round of affidavits that conflict with the first and offer questionable explanations of the evidence, and apparent efforts by counsel to conceal evidence, both during the underlying recruitment process and through a facially inadequate privilege log. In yet another example of subterfuge, an Alliant witness testified that Alliant hired each of the Former Employees after a legitimate application and interview process, in which each Former Employee came in independently, identified a job opening on Alliant's website, and interviewed for the job. *See* Ex. 302 at 88. The contemporaneous documents indicate that this "process" was a sham that Alliant and its counsel created for purposes of litigation. *See* Ex. 163. For a company that claims it was not doing anything wrong, Alliant expended a great deal of effort trying to cover it up.

### 5. Absence of Justification

As to the fourth element, Alliant contends that its actions were justified on the basis of competition. Alliant says it "was merely seeking to hire qualified candidates to grow its business." Dkt. 192 at 64. As Alliant sees it, no one did anything wrong, but assuming for the sake of argument that the Producing Members breached their Member Agreements, any remedy should flow only against those individuals and not against Alliant, because Alliant was justified in competing with Lockton for employees and customers.

37

When dealing with a tortious interference claim by one business against a competitor, Missouri follows Section 768 of the Restatement (Second) of Torts. *See Briner Elec. Co. v. Sachs Elec. Co.*, 680 S.W.2d 737, 741 (Mo. Ct. App. 1984). That section distinguishes between (i) situations in which neither competitor has any contract-based expectancy regarding the object of competition, such as an employee at will or a future business prospect, and (ii) situations in which the plaintiff has a contract-based expectancy regarding the object of competition, such as an employee bound by contractual obligations that are not terminable at will or a customer bound by an ongoing contract not terminable at will. *See* Restatement (Second) of Torts § 768(2) (Am. Law Inst. 1979).

In the former setting, both parties are justified in competing, and to establish tortious interference, the plaintiff must show that the defendant employed improper means. *W. Blue*, 367 S.W.3d at 20. "Improper means are those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or common law." *Id.* (internal quotation marks omitted).

In the latter setting, the analysis is different. "[A]n existing contract, if not terminable at will, involves established interests that are not subject to interference on the basis of competition alone." Restatement (Second) of Torts § 768, cmt. a.

> The rule that competition is not an improper interference with prospective contractual relations as stated in Subsection (1) does not apply to inducement of breach of contract. When B is legally free to deal either with C or with A, freedom to engage in competition implies a privilege on the part of A to induce B to deal with him rather than with C. But when B is legally obligated to deal with C, A is not justified by the mere fact of competition in inducing B to commit a breach of his legal duty. Under the general rule stated in §

767, the social interest in the security of transactions and the greater definiteness of C's expectancy outweigh the interests in A's freedom of action in this situation.

*Id.*, cmt. h. A defendant who relies solely on competition when inducing breach of a contract not terminable at will has acted without legitimate justification. *See id.*, cmt. i.

These rules apply to employment contracts, which may implicate both doctrines:

An employment contract, however, may be only partially terminable at will. Thus it may leave the employment at the employee's option but provide that he is under a continuing obligation not to engage in competition with his former employer. Under these circumstances a defendant engaged in the same business might induce the employee to quit his job, but he would not be justified in engaging the employee to work for him in an activity that would mean violation of the contract not to compete.

*Id.*

Under Missouri's application of this doctrine, "[a] competitor is rarely if ever justified in interfering with another employer's covenant not to compete." Henry F. Luepke, *Tortious Interference With Covenants Not To Compete*, 66 J. Mo. B. 88, 90 (2010).

A competitor's interest in interfering with another employer's covenant not to compete does not extend beyond the mere prospective interest in hiring or retaining the employee who has breached the covenant. Such a prospective interest is not superior to and does not defeat the existing rights and interests created by a valid covenant not to compete.

*Id.* (citing *Howard v. Youngman*, 81 S.W.3d 101, 115 (Mo. Ct. App. 2002)). To that end, the Missouri Court of Appeals has held that a competing business acted without justification when it knew that an employee had a non-compete, hired that employee, and then pursued a business plan that would cause the non-compete to be violated. *See Horizon Mem'l Gp. v. Bailey*, 280 S.W.3d 657, 664 (Mo. Ct. App. 2009). Federal courts applying Missouri law have likewise held that a competing business acts without justification when

it knowingly hires an employee bound by a non-compete, intending to complete unfairly with the former employer by having the employee violate his non-compete.[20]

In this case, the Producer Members could terminate their employment at will, but the contractual obligations imposed by the Customer Non-Solicit, Employee Non-Solicit, and the Confidentiality Restriction were not terminable at will.[21] The first two obligations continued for two years post-employment (and four years for the Producer Partners), and the latter obligation continued indefinitely. Alliant's interest in competition does not justify causing the newly hired Producer Members to breach their restrictive covenants.

Assuming for the sake of argument that Lockton had to show improper means, it is reasonably likely that a court would find that Alliant's seven-month campaign to engineer

---

[20] *See, e.g.*, *Express Scripts, Inc. v. Lavin*, 2017 WL 2903205, at *6 (E.D. Mo. July 7, 2017); *Oros & Busch Application Tech., Inc. v. Terra Renewal Servs., Inc.*, 2013 WL 6198159, at *7 (E.D. Mo. Nov. 27, 2013); *Am. Builders & Contractors Supply Co., Inc. v. Roofers Mart, Inc.*, 2012 WL 3027904, at *6–7 (E.D. Mo. July 24, 2012).

[21] This analysis focuses on the Member Agreements. Under the Series LLC Agreement, the Producer Members were required to provide thirty-days advance written notice to Lockton before resigning. They could terminate their employment at will, but had to comply with the notice requirement. Alliant knew about the thirty-day notice requirement, yet instructed the Producer Members to resign without notice. The obvious purpose of the notice obligation was to give Lockton an opportunity to handle the Producer Members' departure in an orderly way, including by communicating with Lockton customers and employees who could be affected. It is reasonably probable that a trier of fact would find that Alliant induced the Producer Members to breach the notice requirement so that Lockton would not have this opportunity and instead would face immediate competition from the Producer Members. Alliant took other actions to limit Lockton's ability to respond, such as by preparing preemptive litigation and by coordinating the mass resignations for Tuesday, March 12, while the Lockton business leaders would be at a retreat.

a mass resignation by Alliant personnel and the myriad actions that Alliant took during this period constituted improper means. The Missouri Supreme Court has held that a defendant who was not bound by a non-compete used improper means when she induced the plaintiff's employees to resign without notice and to time their resignations to impair the plaintiff's ability to respond. *See W. Blue*, 367 S.W.3d at 20. Alliant did that. Alliant also took independently wrongful steps such as directing McDaniel to destroy evidence and providing inaccurate affidavits to a court. *See id.* (upholding finding of improper means where departing employee engaged in computer tampering). A federal court applying Missouri law has found that a competitor used improper means when it induced a breach of fiduciary duty by the plaintiff's employees during the course of its recruiting efforts. *See Synergetics, Inc. v. Hurst*, 477 F.3d 949, 959 (8th Cir. 2007). Although this decision has not analyzed Lockton's fiduciary duty claim in detail, the evidence regarding the Producer Members' actions while still in Alliant's employ makes it reasonably likely that a court would hold that Alliant induced the Producer Members to breach their fiduciary duties, supporting a finding of improper means.

### 6. Damages

As to the fifth element, it is reasonably likely that a trier of fact would find that Lockton has suffered significant damage as a result of Alliant's actions. Indeed, there is no dispute that Lockton has suffered harm. The only question is whether that harm is sufficiently compensable by money damages such that an injunction should not issue.

## B. Irreparable Harm

The second requirement for a preliminary injunction is a showing of irreparable

injury if the injunction is not granted. *Revlon*, 506 A.2d at 179. Harm is irreparable unless "alternative legal redress [is] clearly available and [is] as practical and efficient to the ends of justice and its prompt administration as the remedy in equity." *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 557 (Del. Ch. 2000) (internal quotation marks omitted). "Irreparable injury exists when [damages] would involve speculation," such as harmed "reputation, goodwill, customer relationships, and employee morale." *In re Shawe & Elting LLC*, 2015 WL 4874733, at *28 (Del. Ch. Aug. 13, 2015) (internal quotation marks omitted), *aff'd sub nom. Shawe v. Elting*, 157 A.3d 152 (Del. 2017).

A "threat of irreparable injury" typically will exist when a valid restrictive covenant is breached. *Concord Steel. v. Wilm. Steel Processing*, 2008 WL 902406, at *10 (Del. Ch. Apr. 3, 2008). Invariably, there will be uncertainty about what would have happened if the Former Employees had complied with their restrictive covenants. "That is precisely why our law has consistently found a threat of irreparable injury in circumstances when a covenant not to compete is breached. Measuring the effects of breaches [of a restrictive covenant] involves a costly process of educated guesswork with no real pretense of accuracy." *Hough Assocs. v. Hill*, 2007 WL 148751, at *18 (Del. Ch. Jan. 17, 2007) (Strine, V.C.). Disgorgement of profits or some other measure of monetary harm may be available, but the efficacy of these measures is "limited, at best, to specific transactions and would not fully account for the impact on longstanding relationships." *TriState Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *13 n.147 (Del. Ch. Apr. 15, 2004). Because of the difficulties inherent in crafting after-the-fact damages remedies in these cases, "injunctive relief [is] the principal tool of enforce[ment]." *Hough*, 2007 WL 148751,

42

at \*18; *accord Concord Steel*, 2008 WL 902406, at \*10.

These principles apply fully to this case. Lockton has shown that it is suffering irreparable harm. Alliant has solicited almost 150 Lockton customers, and those efforts are ongoing. Some fifty Lockton customers have moved their business to Alliant to date, and two valuable customers have announced their intention to put their business out to bid. If Alliant's solicitation efforts continue, Lockton faces the threat of losing still more clients.

Quantifying harm from these losses will be difficult. *See Dickinson Med. Gp. v. Foote*, 1984 WL 8208, at \*3 (Del. Ch. May 10, 1984). During oral argument, Alliant tried to argue that the damages analysis would be simple because Lockton's expert witness agreed that it was possible to value Lockton using a discounted cash flow analysis, incorporate different estimates of future revenue into the projections, and reach a damages conclusion. Lockton's expert witness also agreed that it was possible to model other damages components, such as cross-selling opportunities. Based on this testimony, Alliant jumped to the conclusion that damages provide an adequate remedy.

But Alliant's counsel understandably reserved Alliant's right to argue about every possible aspect of the damages analysis. For starters, Alliant can be expected to dispute whether any particular customer moved its business because of a breach of the restrictive covenants. Determining causation on a customer-by-customer basis is a potentially massive and complex inquiry, requiring an assessment of the mental state of each former customer. Alliant's counsel also pointed out that the causation inquiry would have to take into account, again on a client-by-client basis, whether Lockton had made a sufficient effort to mitigate the loss of the client by seeking to win them back. With fifty customers already

in play, addressing these issues would be a prodigious and uncertain task, and while Alliant's counsel suggested that the court could address this issue by allowing sampling, he understandably reserved Alliant's right to dispute whether sampling was legitimate.

Having waded through the causation question, the court would then have to turn to the damages models themselves, which Alliant of course reserved the right to challenge. Although Alliant's counsel sought to depict the use of a discounted cash flow analysis as a single-dose solution to every damages ill, anyone familiar with Delaware's appraisal jurisprudence knows about the many inputs that go into a discounted cash flow analysis and the difficulties a court faces in deriving a reliable valuation conclusion.[22] Alliant's arguments about irreparable harm ended up supporting Lockton's application for injunctive relief by demonstrating the myriad issues that this court would have to confront in a damages analysis.

Lockton is also entitled to a finding of injunctive relief because the Member Agreements contained stipulations establishing that a breach would give rise to irreparable harm. *See, e.g.*, Ex. 21 §§ 4.2(f), 7.1, 7.2. Alliant obtained copies of the Member

---

[22] *See, e.g.*, *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1, 35–36 (Del. 2017) (citing the "over 1,100 variable inputs in the competing DCFs" and finding multiple errors in trial court's DCF analysis); *DFC Glob. Corp. v. Muirfield Value P'rs*, 172 A.3d 346, 379 (Del. 2017) (identifying five "non-exclusive reasons" for finding error in trial court's DCF analysis); *In re Appraisal of PetSmart, Inc.*, 2017 WL 2303599, at *32 (Del. Ch. May 26, 2017) ("As this court has determined time and again, if the data inputs used in the [DCF] model are not reliable, then the results of the analysis likewise will lack reliability." (internal quotation marks omitted)); *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 332 (Del. Ch. 2006) (Strine, V.C.) ("Without a reliable estimate of cash flows, a DCF analysis is simply a guess.").

Agreements, reviewed them, and understood their terms. Alliant nevertheless proceeded to induce the Producer Members to breach the Member Agreements. Consequently, the provisions addressing irreparable harm that appear in those agreements weigh in favor of finding a threat of irreparable harm sufficient to support injunctive relief.

## C.      Balancing of Hardships

The final element of the injunction standard is the balancing of hardships:

> [A] court must be cautious that its injunctive order does not threaten more harm than good. That is, a court in exercising its discretion to issue or deny such a preliminary remedy must consider all of the foreseeable consequences of its order and balance them. It cannot, in equity, risk greater harm to defendants, the public or other identified interests, in granting the injunction, than it seeks to prevent.

*Lennane v. ASK Comput. Sys., Inc.*, 1990 WL 154150, at *6 (Del. Ch. Oct. 11, 1990) (Allen, C.). The equities favor Lockton.

The question is whether to enjoin Alliant, between now and a final decision after trial, from engaging in activities that the Member Agreements restrict the Producer Members from conducting. Alliant argues that even if an injunction could be entered against the Producer Members, no injunction should issue against Alliant, because Alliant is not a party to the Member Agreements.

In the *Hough* decision, Chief Justice Strine, while sitting on this court, addressed a similar argument by an employer (BE & K) who had hired an employee (Hill) who was subject to a non-competition agreement with his former employer (Hough). Then-Vice Chancellor Strine observed:

> BE & K is also poorly positioned to complain about an injunction. Its conduct was hardly inadvertent and it was obviously aware of the terms of Hill's

45

noncompete, including the remedial provision addressing irreparable harm and injunctive relief. It cannot claim surprise that an injunction might issue against it in the event that Hough complained of its conduct in employing and collaborating with Hill when that remedy was expressly contemplated by the Non-Competition Agreement it reviewed.

*Hough*, 2007 WL 148751, at *18. Elsewhere in the decision, then-Vice Chancellor Strine explained that important public policy interests supported the issuance of an injunction against the new employer:

> Much of the benefit of a non-compete derives from its ability to create before-the-fact (ex ante) alterations to parties' behavior based on the threat of after-the-fact (ex post) injunctive relief in the event of breach. Unless parties like Hill and BE & K realize that injunctive relief should be expected in the event of a clear breach, non-competition agreements will not produce their indented effect, breaches will proliferate, and complicated damage inquiries into the "what might have been" world will ensue.

*Id.* The reasoning from *Hough* applies fully to this case and supports the issuance of injunctive relief against Alliant.

Alliant also argues that it should not be enjoined from engaging in activities that would be prohibited under the Member Agreements using other resources, such as other Alliant offices and employees or through Former Employees who were not Producer Members. The problem for Alliant is that its ability to compete with Lockton is tainted. When Alliant pitches a client of the Producer Members to move its business from Lockton to Alliant, or argues that it can better service the client than Lockton, the client's decision will necessarily be influenced by the fact that the Producer Members and their teams are now at Alliant. Even a pitch made by Alliant's Chicago office using only Chicago personnel would benefit from the effect of the presence of the Producer Members and their teams in Denver. Ensuring compliance with an injunction directed at anything less than

Alliant as an organization would also be difficult to monitor and enforce. Alliant and the Producer Members have demonstrated their willingness and ability to engage in secretive and underhanded behavior in violation of contractual obligations and legal requirements. Alliant and the Former Employees have demonstrated their willingness and ability to mask their activities under a façade of compliance measures and through misleading representations and averments. I lack confidence that Alliant would abide by an injunction directed at anything less than Alliant as a whole. I similarly lack confidence that Lockton would be able to detect Alliant's breaches and prove them to the court.

Similar reasoning applies to Alliant's claim that the injunction should not limit the rights of the Former Employees who are not bound by Member Agreements. Alliant contends that it is unfair to include the other Former Employees in an injunction against Alliant, but the other Former Employees are not well positioned to segregate themselves from the Producer Members. The other Former Employees worked with and for the Producer Members, comprising the teams who supported the Producer Members in generating and servicing their customers. The other Former Employees joined Alliant to continue working with and for the Producer Members. To a large degree, the Producer Members act through the other Former Employees. Any injunction based on Alliant's interference with the conduct of the Producer Members must therefore extend to the other Former Employees. Otherwise, Alliant could do indirectly through the Former Employees what it could not do directly through the Producer Members.

The Former Employees are also not well positioned to claim the indulgence of equity. They were part of a grand scheme with Alliant to decimate Lockton's Denver office

47

through the mass walkout on March 12, 2019. There is evidence that they coordinated with other Former Employees while still at Lockton, plus evidence that two Former Employees (Jain and Erickson) took confidential information that they have used to benefit Alliant. None of the Former Employees were individuals who simply happened to show up at Alliant and are now being caught up in a trawler's net. Nor do the Former Employees face significant risk of personal financial harm from the issuance of an injunction. The Producer Members and the senior managers are guaranteed full compensation for at least three years even if a court grants injunctive relief. It seems unlikely that Alliant would take punitive action against the lower-level employees who comprise the Producer Members' teams.

Alliant also has argued that an injunction should not limit its ability to continue serving the Lockton customers who have already moved their business to Alliant, claiming that such an order would interfere with customer choice. Alliant believes that it should at least be permitted to use employees other than the Producer Members to continue to service the Lockton customers it has captured to date. But the choices that its recently acquired customers made appear tainted by Alliant's own misconduct, and permitting Alliant to retain the fruits of that misconduct would compound its breach and the harm to Lockton. In a case involving tortious interference with a non-competition agreement, this court issued a preliminary injunction barring the defendant from continuing to do business with the clients it had acquired, noting that the defendant "willfully and knowingly took advantage of [the employee's] relationship with [the former employer's] clients in order to gain 'an in' with those clients to aid its efforts to solicit them." *TriState*, 2004 WL 835886, at \*14. Even though the injunction threatened to affect the competitor's ongoing viability

48

as a business, this court held that the competitor's "awareness of [the employee's] contractual obligations (including the prohibitions against his solicitation of [his former employer's] customers)" caused the balance of the equities to favor an injunction. *Id.* The same is true here. Having orchestrated a collective breach of the Customer Non-Solicit for its own benefit, Alliant cannot now invoke client choice to avoid a preliminary injunction designed to address the consequences of its actions.

Notwithstanding Alliant's indecorous attempt to cloak its misconduct in the mantle of customer choice, I have considered the effect of an injunction on the customers. Pending the outcome of this litigation, Alliant will not be able to service their business, so they will have to go elsewhere. Some may go back to Lockton, but having recently switched their business, others may not. There is a burden associated with customers having to shift their business again, and an additional burden associated with the choice to find a new broker, but the record indicates that the insurance brokerage industry is highly competitive, and there appear to be multiple firms that can provide the necessary services. If customers are upset, they can blame Alliant, which chose to induce the Producer Members to breach restrictive covenants that both they and Alliant believed were enforceable and which tracked the restrictions that Alliant demands from its own employees.

Issuing a preliminary injunction in this case will restore the status quo, at least to the extent possible, pending a final determination on the merits after trial. Before Alliant interfered with Lockton's rights, Lockton could reasonably expect that it would not face competition from its Producer Members and their teams for a period of two years after the termination of their employment. Issuing an injunction against Alliant gives Lockton part

of the benefit of its bargain. Although an injunction at this stage cannot prevent the solicitation that Lockton has already suffered, it can stop Alliant from continuing to engage in prohibited conduct. Without an injunction, the restrictive covenants in the Member Agreements would be rendered practical nullities, sufficient only to support a difficult and inexact damages award. Lockton will have lost the protection of the restricted covenants during the intervening period.

Not only would the denial of an injunction impair Lockton's rights between now and trial, it would also provide Alliant with an opportunity to compete that it could not reasonably have expected to have. When Alliant set out to solicit the Producer Members and their teams, Alliant could not have reasonably expected that it would be able to use the Producer Members to compete immediately with Lockton. Alliant obtained the Producer Members' agreements and identified the restrictive covenants that they contained. Alliant has already had three months in which to compete with Lockton in ways prohibited by the Member Agreements. Denying injunctive relief would permit Alliant to continue competing in prohibited ways between now and a final decision on the merits.

Although it is not possible to fully recreate the status quo pending trial, a preliminary injunction can go part of the way. Before the raid, Alliant did not have the benefit of the Producer Members or their teams, and Alliant had no ability to use the Former Employees to attract Lockton's clients. Alliant also did not have access to the knowledge that the Former Employees have about Lockton's business plans, prospect lists, and confidential customer information. It is true that before the raid, Alliant could have solicited Lockton's clients using its existing employees, but Alliant had little chance of taking business from

Lockton under those circumstances, because Lockton has a customer retention rate of 94–96%. Alliant therefore will suffer relatively minimal harm from having to live by an injunction pending a final decision on the merits after trial.

Alliant's last two arguments cite collateral matters. Alliant argues that Lockton's application should be denied because Steve Lockton, one of the top executives at that firm, sent profane and insulting texts to the Former Employees. Lockton has admitted that the texts were inappropriate and wrong, and Lockton disciplined Steve Lockton by putting him on indefinite leave and reassigning his clients to other producers. Steve Lockton testified that he reacted in the heat of the moment to what he perceived to be a betrayal by over twenty of his colleagues. His impetuous behavior is largely beside the point.

Alliant also points to evidence that Lockton has engaged in efforts to recruit employees from other firms and that those efforts have resulted in litigation. The gist of this argument appears to be that everyone in the insurance brokerage business does what Alliant has done, so the court should not get involved. This court's task is not to judge the conduct of the insurance brokerage industry, nor to consider other situations not presently before the court. My task is more narrow: to evaluate Lockton's claims against Alliant based on Alliant's conduct in engineering a mass resignation from the Denver office. What may have happened in other cases does not undermine the case for an injunction.

The injunction that this court will enter only will prohibit Alliant from engaging in conduct that is prohibited by the Member Agreements. First, pending a final decision after trial, Alliant is enjoined from, directly or indirectly, soliciting, inducing, persuading or encouraging, or attempting to solicit, induce, persuade or encourage, any of the Customer

51

Accounts, as that term is defined in the Member Agreements, to reduce, terminate or transfer to a competitor any products or services that are the same or substantially similar to, or directly competitive with, the products or services provided by Lockton ("Competitive Business"). This restriction parallels the language of Section 5.4 of each Member Agreement.

Second, pending a final decision after trial, Alliant is enjoined from, directly or indirectly, (i) accepting, servicing, or working on any Competitive Business from any of the Customer Accounts or (ii) in any way doing business with any of the Customer Accounts to the extent such business is the same or substantially similar to the business Lockton did with the Customer Account. This restriction also parallels the language of Section 5.4 of each Member Agreement.

Third, pending a final decision after trial, Alliant is enjoined from, directly or indirectly, soliciting, recruiting, hiring, inducing, persuading, or encouraging any employee, member or consultant of Lockton to terminate their employment, membership or consultant relationship with Lockton, or to render services for any competitor of Lockton. Pending a final decision after trial, Alliant is enjoined from, directly or indirectly, taking any action to interfere with any employee's, member's or consultant's relationship with Lockton. Pending a final decision after trial, Alliant is also enjoined from attempting to take any of the forgoing actions regarding Lockton's employees, members, or consultants. This restriction paraphrases Section 5.3 of each Member Agreement.

Fourth, pending a final decision after trial, Alliant is enjoined from using or attempting to use any Confidential Information (as that term is defined in each Member

Agreement) for any purpose. Alliant is likewise enjoined from acquiring, accessing, duplicating, copying, removing, downloading, uploading, saving, emailing, transmitting or otherwise taking any Confidential Information, or attempting to do any of the foregoing. Alliant is also enjoined from disclosing or attempting to disclose any Confidential Information. This restriction paraphrases Section 4.3 of each Member Agreement. Nothing about this aspect of the preliminary injunction shall affect Alliant's ability to conduct litigation involving Lockton in this or any other pending action.

Because an injunction in this form tracks the obligations found in the Member Agreements, the equities favor its issuance. The equities also favor Lockton because of substantial evidence that Alliant set out in bad faith on a strategy to induce Lockton's employees to breach their agreements. Alliant is a sophisticated entity and repeat player. It raided Lockton knowing about the risks, and it prepared for litigation from the outset. It cannot now complain about suffering the foreseeable consequences of its actions. *See Hough*, 2007 WL 148751, at \*19.

### D.    The Indispensable Parties Argument

Alliant has separately argued that this case must be dismissed under Court of Chancery Rule 19. That argument falls short.

Rule 19(a) instructs a court to join a person as a party to an action in two situations. The first is if "in the person's absence complete relief cannot be accorded among those already parties." Ct. Ch. R. 19(a)(1). The second is if

> the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest

or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Ct. Ch. R. 19(a)(2). Rule 19(b) states that if a person meets either test and cannot be made a party, then "the Court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." When determining whether a party is indispensable, the factors to be considered include:

- To what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties.

- The extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided.

- Whether a judgment rendered in the person's absence will be adequate.

- Whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

In this case, the Former Employees are not indispensable parties.

The Former Employees do not fall within Rule 19(a)(1), because in their absence, this court can provide complete relief to Lockton and Alliant. "[T]here is no requirement that [a tortious interference claimant] join the other party to the contract as a defendant." *CPM Indus., Inc. v. Fayda Chems. & Minerals, Inc.*, 1997 WL 762650, at *4 (Del. Ch. Dec. 1, 1997). A plaintiff can choose to pursue a theory of secondary liability, such as tortious interference, aiding and abetting, or conspiracy, without having to name the primary wrongdoers. *See Manley v. MAS Assocs., LLC*, 2009 WL 378172, at *2 (Del. Feb. 17, 2009) (ORDER) (describing the law as "well settled" that "joint tortfeasors are not

necessary parties whose joinder is mandatory"); *Roberts v. Delmarva Power & Light Co.*, 2007 WL 2319761, at *3 (Del. Super. Aug. 6, 2007) (same). The relief that Lockton has requested in this action relates only to Alliant. That relief can be entered "without requiring the non-party Former Employees to be joined as parties." *Miles, Inc. v. Cookson Am., Inc.*, 1994 WL 114867, at *2 (Del. Ch. Mar. 3, 1994).

The Former Employees also do not fall within Rule 19(a)(2)(ii), which addresses whether "the persons already parties" would face "a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." The only "persons already parties" to this lawsuit are Lockton and Alliant, and refraining from adding the Former Employees would not subject Alliant to "double, multiple, or otherwise inconsistent obligations." Any judgment entered against the Former Employees in Missouri would only bind the Former Employees, just as any judgment entered here against Alliant would only bind Alliant. Nor could Lockton use multiple judgments to achieve an excessive recovery. Under the "one satisfaction" rule Lockton can only recover once for its losses. *See Incyte Corp. v. Flexus Biosciences, Inc.*, 2016 WL 1735485, at *8 (Del. Super. Apr. 19, 2016).

This leaves Rule 19(a)(2)(i), which asks whether failing to join the Former Employees may "as a practical matter impair or impede [their] ability to protect [their] interest." The Former Employees do not face legal prejudice because they "cannot be bound by the judgment rendered." *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 1983 WL 8942, at *6 (Del. Ch. Dec. 13, 1983); *accord Miles*, 1994 WL 114867, at *5. At most, this court's ruling might be persuasive authority or *stare decisis*, but Rule 19(a) "does not require joinder simply because of the possible effect of *stare decisis* on the absent person's

rights; rather, the court need only require joinder when the persuasive effect is not speculative, is direct and immediate, and is encompassed by the rules of collateral estoppel or issue preclusion." *Kuhn Constr. Co. v. Ocean & Coastal Consultants, Inc.*, 723 F. Supp. 2d 676, 691 (D. Del. 2010) (citing *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 407–09 (3d Cir. 1993)). In any event, it seems unlikely that the Missouri court, which has far greater expertise in Missouri law, would defer to this court's rulings. Absent the need for a forum that could address Lockton's claims against Alliant on an expedited basis, this court would have awaited the Missouri court's assessments, not the other way around. This is also not a case in which Lockton seeks to prohibit Alliant from employing the Former Employees. They can continue to work for Alliant regardless of the outcome of this case. *See Miles*, 1994 WL 114867, at *3.

Joinder of the Former Employees is also not required under Rule 19(a)(2)(i) because Alliant can product their interests. "It is settled law that an action may continue without an absent party if that party interest is fully represented therein." *RJ Assocs. v. Health Payors' Org. Ltd. P'ship*, 1999 WL 550350, at *7 (Del. Ch. July 16, 1999) (collecting cases). Alliant employs the Former Employees, benefits from their work on its behalf, and has every interest in defeating Lockton's claims. Alliant's outside counsel represents both Alliant and the Former Employees, and Alliant is paying for the Former Employees' representation. By virtue of its control over the Former Employees, Alliant can cause them to participate in this action as Alliant directs. The Former Employees in fact participated in this action for purposes of both document discovery and deposition discovery and through the submission of affidavits. The Former Employees' interests are thus fully

protected in this proceeding. *See CPM*, 1997 WL 762650, at *4; *Flerlage v. KDI Corp.*, 1986 WL 1397, at *6–7 (Del. Ch. Jan. 29, 1986).

Assuming for the sake of argument that the Former Employees met one of the tests under Rule 19(a), they would still not be indispensable. First, as noted, a judgment entered in this action cannot be enforced against the non-party Former Employees, minimizing the risk of prejudice. *Miles*, 1994 WL 114867, at *4. Second, "[t]he ability to intervene in an action, although not determinative, may be viewed as a factor that lessens any potential prejudice resulting from a future judgment." *Id.* at *5. The Former Employees could intervene in this case if they truly felt the need to protect their interests. More accurately, Alliant could cause the Former Employees to intervene in this case. Third, a judgment in the absence of the Former Employees would be adequate to vindicate Lockton's rights and remedy Lockton's injuries. If Lockton were made whole through this litigation, there would be no need for Lockton to continue with its claims against the Former Employees. Finally, to the extent necessary, this court can address the interests of the Former Employees when crafting relief by shaping a decree which makes clear that it is not addressing the Former Employees' rights. *See NuVasive, Inc. v. Lanx, Inc.*, 2012 WL 2866004, at *1, *5–6 (Del. Ch. July 11, 2012).

The Former Employees are not indispensable parties. Accordingly, Rule 19 does not require dismissal of this action.

### III.    CONCLUSION

Lockton's motion for preliminary injunction is granted. The court will enter separately a form of order implementing this relief.